622 So.2d 748 (1993)
Hattie M. HOLMES
v.
The GREAT ATLANTIC AND PACIFIC TEA COMPANY d/b/a A & P Food Store.
No. 92-CA-2148.
Court of Appeal of Louisiana, Fourth Circuit.
July 15, 1993.
Rehearing Denied September 15, 1993.
*749 Gothard J. Reck, Hugh C. Uhalt, Uhalt and Reck, New Orleans, for plaintiff-appellant.
Robert E. Peyton, Elizabeth S. Cordes, Christovich & Kearney, New Orleans, for defendant-appellee.
Before KLEES, BYRNES and WALTZER, JJ.
WALTZER, Judge.
This is an appeal from a judgment of the Civil District Court, Parish of Orleans, the Honorable Richard J. Garvey, Judge presiding, granting damages in the amount of $49,608.33 to the plaintiff Hattie M. Holmes. The damages awarded are in conformity with a jury verdict awarding $7,358.33 in past and future medical expenses, $7,250.00 in past and future lost wages or income and $35,000.00 in past and future pain, suffering, disability, and mental anguish. Defendant, The Great Atlantic & Pacific Tea Company, hereinafter "A & P" admitted liability. The case went to trial on the issue of damages, plaintiff contending that her injuries and multiple surgeries were the result of a slip and fall in defendants' grocery store and defendant contending that her injuries were the result of a pre-existing rheumatoid arthritic condition.
*750 Plaintiff Hattie M. Holmes appeals, raising only one issue on appeal, namely that the trial court erred in its handling of peremptory challenges made to various jury venire members.
The jury venire consisted of 32 people. The voir dire commenced with Judge Garvey introducing the attorneys. Judge Garvey then inquired if any of the prospective jurors knew any of the attorneys or parties. He then instructed the attorneys to read their respective will call and may call lists and asked the jurors if any of them knew any of the witnesses on the would or may be called lists. He then in general terms explained the concepts of fault and damage and their interrelationship and the concept of peremptory challenges. Judge Garvey then instructed the jurors to each tell their name, the type of work they do, who they work for, if they are married and their spouse's work.
The first juror was Barbara Carriere, a married white female in public affairs for a non-profit organization. Her husband worked for the same company in vocational rehabilitation. Judge Garvey inquired about her husband, "What does he do specifically?" and "What's his educational background?"
The second juror was Annie Higgenbotham, a black female laundry worker employed by the Hilton Hotel and married to a longshoreman on disability.
The third juror was Chrishawn Pitts, a single black female employed by MacKruegers and a sophomore at Delgado Community College.
The fourth juror was Florence Jackson, a black female respiratory therapist employed by Ochsner and married to a merchant marine seaman.
The fifth juror was Diana Dupre, a white female Marketing Director for Weber Realty Group. Her marital status was not mentioned.
The sixth juror was Hazell Froehlich, a white female bartender employed by the Best Western Hotel and married to a chef.
The seventh juror was Doris LeBlanc, a black female employee of Katz & Besthoff Drugstore married to an employee of the Top of the Mart.
The eighth juror was Reuben Hall, a black male cook for the Redemptorist Fathers married to a lady on disability.
The ninth juror was Deborah Joseph, an unemployed black female mother of four married to an employee of a distribution feed company.
The tenth juror was Paris Coleman, a single black male student worker at L.S.U. Medical School.
The eleventh juror was Elizabeth Robin Pennell, a single white female teacher.
The twelfth juror was Aurora Hills, a black female busperson employed by the World Trade Center/International House. No marital status was mentioned.
The thirteenth juror was Evelyn Landry, a white female executive secretary for Petrotech, Inc. married to a Senior Control Specialist at Petrotech.
The fourteenth juror was Dionne Camfield, a single black female clerk for the City of New Orleans Health Department.
The fifteenth juror was Nathachia Hampton, a black female teacher-daycare owner married to an employee of Hill-Behan Lumber Company.
The sixteenth juror was Harriet Langestein, a white female artist and small business owner married to a civil engineer employed by the State of Louisiana.
The seventeenth juror was Lorna Ledet, a female receptionist at Crowder Animal Hospital. No marital status was mentioned.
The eighteenth juror was Lakethia Tyner, a black female executive secretary employed at Desire Community Housing married to a truck driver for Professional Construction.
The nineteenth juror was Gwendolyn Davis, a divorced black female administrative secretary for the Housing Authority of New Orleans.
*751 The twentieth juror was Theresa Nguyen, an asian female self-employed grocery store owner and mother of three married to the grocery store co-owner.
The twenty-first juror was Charmaine Auzenne, a divorced black female secretary at Tulane Medical Center.
The twenty-second juror was Christopher Todd, a white male self-employed owner of a warehouse supply company married to an employee of Delgado.
The twenty-third juror was Marlene Ceasar, a black female computer technician with the Navy married to a truck driver for Roadway Express.
The twenty-fourth juror was Jerrydean Davis, a black female widow employed as a para-professional by the Orleans Parish School Board.
The twenty-fifth juror was Carolyn Jackson, a female teacher at the Orleans Parish School Board married to a real estate agent for Latter & Blum and a carpet layer.
The identification continued through the rest of the panel. When the last juror had stated the requisite information, the trial judge asked if anyone had been sued, suffered a personal injury of any kind, going through the panel a second time. When a juror had been injured, the trial court inquired as to the nature and duration of the injury, whether the juror was still under treatment. The trial judge then inquired as to any other suits or anything else. He further inquired if anyone had ever fallen in a supermarket or public business establishment of any kind, asking the nature of the fall and what kind of business establishment. The trial judge further stated:
"... So what we want to know is there anything that happened in your automobile accident, in your injury case, in your lawsuit, in any part of your lifeand I just use those questions to get us to this pointthat would stop you from being fair and impartial in the decision in this case? Anything that you know about that would say, "I can't be fair in this case"? And that's what these people are entitled to, your fairness. That's what we want to know. Is there anything? Then you ought to tell us. You see, the question you could ask yourself is if you were the plaintiff coming in here and you were going to ask for money because of the fault over here, would you accept yourself as a juror? Is your mind sufficiently open and clear that you could listen to the evidence and you will be satisfied with the decision that could be rendered? If you're sitting over here being sued, would you accept yourself as a juror? Is your mind sufficiently open that you could be fair and just in the decision of that case? And if you could be a fair juror, then your answer to both questions ought to be yes. I can take this case; I can listen to it without prejudice. I can listen to it and listen to the evidence and listen to the law and do what I think is just and fair and right. Then I can go home and forget about it and I've done my duty. Anybody who cannot do that, give both sides a fair judgment? ..."
After conversation with a juror, the trial judge stated, "Okay, Counsel, I'll give you an additional fifteen minutes to ask any questions that you wish. Let's maybe position that rostrum so that you can see all of the jurors."
Counsel for plaintiff started by asking for a show of hands indicating how many jurors or their close relatives had any trouble with their knees at any point in their lives. He then individually questioned the jurors with raised hands. Plaintiff counsel then inquired if any juror believed that simply because someone had arthritis they would require surgery. He then questioned one juror about his wife's rheumatoid arthritis. Plaintiff counsel then asked how many jurors had a paid housekeeper or nanny and did any jurors have close friends or family members so employed. He questioned those jurors who so indicated. Plaintiff's counsel then asked, "For those of you who have just told me about your family or your friends who have worked as housekeepers or nannies, do you know or was it ever made known to how that they worked with arthritis or they worked in *752 pain from doing the housekeeping duties?" He then further questioned those jurors.
Plaintiff's counsel then stated:
"All right. Does anyone feel as we sit here todayand you will be called to judge the evidence and the facts in this casethat somehow our system is incorrect or wrong, that people shouldn't be allowed to come and seek compensation for the damages they have sustained as a result of the fault and negligence of others? Anyone feel that somehow our system should be changed or altered? In this case, the defendants have admitted that they will be responsible for all of the consequences that will be established as a result of their own fault. And as his honor has told you, you will be deciding what those damages are and to determine the amount of money and compensation because our system knows of no other way to repair the injury that is done. Do any of you feel because there is an admission of fault here by the defendant that somehow the defendant should be entitled to some better deal and because they have admitted their error and their fault that you feel as though as a result of that, they're entitled to some lesser amount or pay some lesser amount of damages? Okay, I don't see a show of hands ..."
Counsel for plaintiff then stated:
"Does anyone as we sit here today, is there anyone who believes that you really can't be seriously injured as a result of slipping and falling on a floor, somehow that that can't really injure you badly? Does anyone believe that? That's all we have, Your Honor, Thank you very much."
Defense counsel then began his 15 minutes of additional questions:
"... Mr. Reck just asked you if you felt because the defendant admitted responsibility for this accident whether or not we should get any kind of break. Well, by the same token, does anybody believe that because we have admitted responsibility for the fall that we should be punished in any way, or would you be able to listen to the evidence and the law and award Ms. Holmes a fair amount of money for the injuries caused by the accident? Can anyone be unable to do that? Does everyone understand that your decision has to be based on the evidence from that witness stand and then apply it to the law that Judge Garvey gives you and that pure sympathy, pure sympathy for Ms. Holmes, the plaintiff, should not affect your judgment? If it did, I tell you frankly I could go home now because Ms. Holmes is a nice person. She's a good person. But does everybody understand that we're here to determine what injury is caused by our accident and not to give her money because we feel sorry for her or because she's a good person? This case, in my opinion, the central issue in this case is to determine what is causing the disability that we recognize that Ms. Holmes has. Mr. Reck and Mr. Uhalt say it's all because of our accident on August 30th, 1988. We believe it's because of an unrelated medical condition known as rheumatoid arthritis. That's the issue we are going to introduce proof on. Can I expect all of you if we prove or more properly if the plaintiff proves of fails to prove that the injuries are truly caused by the accident and we show you and the evidence shows you that only a small part of her injury was caused by our fault, can I expect all of you to make that hard decision and give her a small amount of money because that was all that was caused by the accident? Can I expect that from everyone? That's all I have, Your Honor."
The trial transcript continues:
"THE COURT:
Good. If you'll review your papers and we'll meet up here at this bench and make our selections.
(Whereupon, there was a bench conference among the Court and Counsel at this time.)
THE COURT:
This is where we do the exercise of the challenges that I spoke to you about. And we are going to go through that and *753 communicate that back to you. Everybody remember where they're seated right now. Let's take a ten minute recess and then come right back here. I'm going to take the objections of the lawyers, put it on the record. We're going to come right back here and I'm going go pick the 12 and I'm going to excuse the rest of you. So in ten minutes come right back here and sit down. Keep your seats.
(Whereupon, there was an in-chambers conference among the Court and Counsel at this time.)
MR. PEYTON:
Your Honor, I object to the seemingly obvious exclusion of jurors in this by plaintiff's counsel on the basis of race. I don't know whether there was a Freudian slip there or not. But until "Mr. Reck corrected himself and accepted Ms. Ledetand I suggest he realize that he had cut every other white juror. I don't think any other black had been excluded. Everyone of his challenges had been used against white jurors. I suggest, Your Honor that under Edmondson and Batson and its progeny, we can show that there is no objective fair logical reason to exclude those jurors other than to exclude them on the basis of their race. There is a pattern that is sometime mentioned in the case ... we won't ever see a pattern because every one of these white jurors was excused. And I object to this. I think those jurors should be seated unless Mr. Reck can come up with a race neutral explanation or some objective reason why they should not sit as jurors.
THE COURT:
Okay.
MR. RECK:
Counsel, apparently being over-zealous, he has either overlooked or ignored the fact that certainly what he said is absolutely not true. Speaking directly to that issue, the plaintiff accepted Ms. Langestein long before he excused Ms. Ledet, and Ms. Langestein is as white as they get; notwithstanding that, of Counsel's misstatement on the record, the same argument can be made for counsel in his challenges for cause, peremptory challenges, but notwithstanding that Counsel was wrong the first time. We can tell the Court, Ms. Carrierewe believe that the Court is in error in not excusing Ms. Carriere for cause and we believe she is not the type who would identify with the plaintiff. She can't sit fairly. She works for a vocational rehabilitation company. Her husband is a vocational rehabilitationist. She absolutely should be challenged for cause. The Court refused that. So we challenged her peremptorily ... But then I want to make the same objection on the defendants. The Edmondson case had to do with the challenge to black jurors rather than the challenge to white jurors. There is no reason why the defendant challenged juror number two, Ms. Higgenbotham other than she is black; notwithstanding that, we challenged Ms. Dupre, number five; she's a marketing director. She has nothing in common with the plaintiff. She cannot sit fairly on these issues. She'll certainly be prejudiced against the plaintiff's interest. We think we have a valid challenge for cause for juror number six, a white woman, a bartender, on her feet all the time. We didn't want her. Should we discount the plaintiff's pain and suffering? Peremptorily, we didn't want her. We think it's a fair challenge for cause. We accepted Ms. Nguyen. We accepted Ms. Ledet, and we accepted Ms. Langestein. We have one, two, three, four, one, two, three white people on the jury Your Honor, and we accepted them all.
THE COURT:
The next one is Landry. You want to talk about her?
MR. RECK:
Ms. Landry works for Petrotech Corporation. When we looked at her, we felt as though she was too sophisticated and was not of the same type that would identify with the plaintiff in this matter. We challenged her. As we stated over and over again, we accepted three white *754 jurors in this case. I don't see any Edmondson challenge at all.
THE COURT:
Who were the three white jurors you accepted?
MR. RECK:
Langestein, Number 16, Ms. Ledet, Number 17, and Ms. Nguyen, Number 20. Now let me make it very clear that in this veneer for the record, as we see it, there are only out of the voir dire, if Your Honor please, of the first 17 jurors, there were six whites. The plaintiff accepted three of the whites. Where is the defendants coming from with the Edmondson challenges? What basis is it to even raise that other than just to talk, just to make some frivolous motion before the Court? The plaintiff takes half of the white jurors by its design and Counsel has the audacity to raise the Edmondson challenge.
THE COURT:
Anything else?
MR. RECK:
We don't think there is any further basis for it.
THE COURT:
Anything else?
MR. RECK:
Yes. And now plaintiff makes the same challenge to defendant as we believe that they excused jurors solely on the basis of race. They excuse Ms. Higgenbotham, juror number two. There is no reason to excuse her. Then they excused juror number four. They excused juror number nine, Ms. Joseph who is black and they excused juror number 15. The defendants have not excused any blacks, any whites. So we make the motion that what they, who they excused was against the Edmondson rule.
THE COURT:
Anything else?
MR. RECK:
That's all.
MR. PEYTON:
Your Honor, all we have gotten frankly is pure conclusions. Mr. Reck has not answered the legal aspects of Edmondson, that you look at each juror individually to say he doesn't like a person's appearance. I was saying, Judge, Counsel uses the racial argument just by using different terms. He doesn't like the way they look. They do look different, Judge. One is black and one is white. He doesn't like one who is sophisticated, another buzzword for racism. If we didn't hear about Edmondson, two or three years ago we'd all be sitting here; we wouldn't mention this because that's what plaintiff's attorney wants to do down at CDC. It doesn't have to be right but it's a fact of life. Edmondson now gives protection to jurors of both races. Counsel suggested that and I don't know if he really meant this. He said that Edmondson only applies to blacks as I understand that correctly. Well, we know that's not true. Race is race. I suggest when you look at each individual juror on their merits, on the meritsand that's what Edmondson says we have to dothere is no logical reason unless we throw out all of our criteria about education, about ability, about working. There is no logical reason to be excluding the white jurors that he excused, one two three, Carriere, Dupre, and Froehlich. He argues that Ms. Carriere works for an organization that deals with vocational rehabilitation. We both have rehabilitation experts. That's not a logical reason. He talks about Ms. Dupre who I think was too sophisticated. Mrs. Froehlich stands on her feet. What does that have to do with the price of tea in China and the real world. As far as my challenges go, if you want to go into that, I excused witnessesthe first witness I excused was Ms. Higgenbotham because her husband was deceased. She has got to have legitimate sympathy for her husband and I excused her for that reason. She also had an accident which is another reason. But the primary reason why I did that was because her husband is disabled. I excused Ms. Joseph, a black lady, because she doesn't work. She was not working. I want people on the jury who have an interest in the *755 economy, who know the value of money, and who may or may not be receiving some kind of benefit. That's not the kind of person I want on a jury; however, Judge, as the cases say, if I had excluded all people who don't work because they happen to be black, that's the Edmondson pattern and I can't do that because the cases talk about unfortunately (sic) in the community as well, many black people don't have jobs. So when you start knocking off people who don't work,, you knock off primarily minorities. One more thing and I don't know if this is a sociological comment or not. Ms. Ngyuen is a Vietnamese I assume or oriental. I think that's a minority as opposed to a white, whatever difference that makes. That's it, Judge.
THE COURT:
Anything else:
MR. RECK:
Counsel, apparently we're notyou're not listening or we're not communicating. Counsel says I gave no specific reasons. I gave specific detailed reasons why I excused each one of these jurors. And then he says that I excused the bartender because she's on her feet all the time. That's a reason. It's a real reason. And it's as real as someone identifying with the plaintiff because her husband is disabled as someone who cannot identify with the plaintiff because she stands on her feet all the time. We excused each one of the white jurors and that we did excuse which were only three of the six on the venire for specific reasons we already told the Court. We believe we meet the Edmondson standards. We didn't say Edmondson applies only to blacks. We said Edmondson, that specific case dealt with the black jurors and excusing of the black jurors without specific reasons. For the same reason, Counsel excused the black jurors, we excused three of the white jurors. Also, Ms. Dupre is single which is another reason why she was excused.
THE COURT:
Anything else?
MR. PEYTON:
Just one thing.
THE COURT:
Finish the record.
MR. PEYTON:
Mr. Reck says he only excused three white jurors. Maybe I misread this. But I see one, two, three, four, five, five in the first part of the panel.
MR. RECK:
I don't see that.
MR. PEYTON:
I thought I saw Ms. Carriere, Ms. Dupre, Ms. Froehlich, Ms. Pennell, right? Am I right?
MR. RECK:
Yes.
MR. PEYTON:
And we're up to Ms. Landry.
MR. RECK:
No, it's five jurors, not in the first panel. That's in the voir dire of 17. Plaintiff excused 5 and 17 and accepted three whites, Your Honor, in 17
MR. PEYTON:
But you excused 5 saying that you only excused 3 for cause.
MR. RECK:
For cause.
MR. PEYTON:
Not for cause. You didn't excuse anybody for cause.
MR. RECK:
I excused them all for cause.
MR. PEYTON:
You did not. You excused them peremptorily.
MR. RECK:
You first began your little speech because I didn't have a cause for excusing the jury.
MR. PEYTON:
No.
MR. RECK:
I did have a cause.
MR. PEYTON:
It's race neutral. We're talking cause and peremptory. Are you suggesting *756 that you excused and the Judge accepted those challenges were for cause and not peremptory.
MR. RECK:
Except I had a cause for excusing them.
MR. PEYTON:
I don't believe he had a race neutral cause for using as peremptory challenge.
MR. RECK:
I don't believe he had a race neutral cause either, Judge, for excusing the black jurors he excused. And I make the same motion he did.
THE COURT:
Anything else?
MR. PEYTON:
No, Your Honor.
THE COURT:
I don't think there was justification in making excuses under the Edmondson law. I'll order the first 12 jurors to serve and the thirteenth juror to be an alternate. So I'm going to go out there and do that and then recess and let you all take a writ.
(Whereupon, Court and Counsel returned to the courtroom at this time.)
THE COURT:
I'm going to ask you twelve to stay there. I'm going to ask Ms. Landry to stay there. I'm going to excuse everybody else. Report back to Ms. Ewell for further instructions. Hold for a minute. Would you all stand, please, and raise your right hand, please.
(Whereupon, the jury stood to be sworn.)
THE COURT:
Do each of you solemnly swear that you will to the best of your ability and understanding listen to the evidence, listen to the law, and decide this case to the best of your understanding so help you God?
* * * * * *
(Whereupon, the jury exited the courtroom at this time.)
THE COURT:
Hold, Counsel. We're going to put some stuff on the record.
THE COURT:
I swore the jury in the manner that I did because I was convinced that the challenges on both sides were made for racial reasons. I felt that the explanations made by Counsel were inadequate and insufficient. I told the jury to return at 1:00 because I wanted to talk with you all and give you an opportunity and tell me which direction you wanted to proceed. If you wish, I will recess until you've had an opportunity to take writs to the Court of appeals. Let's get that out of the way now. If you want to proceed with objections at 1:00 o'clock, I'll do that. I'll hear from both Counsel.
MR. PEYTON:
Can we have just a minute, Judge?
THE COURT:
Surely.
MR. RECK:
Your Honor, we must state that the Court puts us in a dilemma. We truly believe that the court's ruling has effectively denied us the absolute right we have under Louisiana law to peremptorily challenge jurors. We gave the Court, we believe, specific causes and reasons why those peremptory challenges were made. We believe they meet any test for the test of peremptory challenges; however, at this stage to take a writ and to delay this case further while the plaintiff has waited three years to come to trial is much too harsh. So we will simply maintain our objection on this record ant that what we believe the Court has done is error ...
MR. PEYTON:
I do not plan to ask for a writ, Your Honor. I would also object at this time to the Court's refusal to allow me a peremptory challenge of the one juror I did knock off, Ms. Higgenbotham. I hope I've explained myself and also for Ms. Joseph I hope I've explained myself. But with that I will not take a writ.
THE COURT:
Okay. We'll proceed at 1:00 o'clock."
*757 After trial, judgment was rendered in favor of the plaintiff, granting damages in the amount of $49,608.33 plus interest and costs.
On appeal, plaintiff's counsel argues that plaintiff would have been awarded a greater dollar amount if there had been a greater number of blacks on the jury. He further argues that but for the trial court's ruling there would have been more blacks on the jury, that the trial court's ruling was error and that the only remedy available is a new trial.
In State v. Knighten, 609 So.2d 950 (La. App. 4th, 1992), this court stated:
Discriminatory use of peremptory challenges by a prosecutor to exclude potential jurors based solely on race has been long considered a constitutional violation. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). The development of the law regarding this issue has revealed two distinct constitutional rights. Initially, in Swain and Batson, the Supreme Court established that discriminatory use by a prosecutor of his peremptory challenges to exclude members of the criminal defendant's race from the jury violated the equal protection rights of the defendant. Here, the Supreme Court focused primarily on the constitutional right of the defendant to be tried by a jury of his peers. Swain v. Alabama, 380 U.S. at 203-204, 85 S.Ct. at 826-827; Batson v. Kentucky, 476 U.S. [79] at 85-90, 106 S.Ct. [1712] at 1715-1718 [,90 L.Ed.2d 69 (1986) ]. Five years after Batson, the Supreme Court determined that discriminatory use of peremptory challenges by a prosecutor violated the Constitution even when the race of the defendant and the excluded jurors were not the same. In that case, the Supreme Court determined that the right of the potential juror to not be excluded on account of race was being violated, and that the criminal defendant was an appropriate party to raise the excluded juror's claim. Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364 [,113 L.Ed.2d 411] (1991). This Court is thus obliged to determine whether the constitutional rights of either the defendant or the excluded jurors have been violated. The Supreme Court in Batson held that the defendant must first establish a prima facie case of discrimination. The defendant must show facts and relevant circumstances which raise an inference that the prosecutor has used his peremptory challenges to exclude potential jurors on account of race. In making the determination of whether the defendant has fulfilled his initial burden of establishing a prima facie case, "the trial judge should consider all relevant circumstances, including any pattern of strikes by the prosecution against black jurors and any questions or statements by the prosecutor during voir dire examination in exercising his challenges which may support or refute an inference of purposeful discrimination." State v. Collier, 553 So.2d 815, 819 (La.1989); Batson, 476 U.S. at 96-97, 106 S.Ct. at 1722-1723. Once the defendant has established a prima facie showing of discrimination, the burden shifts to the prosecutor to show his race-neutral reasons for his peremptory strikes.
As noted by this court in footnote 1:
In Batson, the Supreme Court ruled that a prima facie case was established when the defendant showed that he is a member of a cognizable racial group, and that the prosecutor has used his peremptory challenges to purposely exclude members of that racial group from the jury. Batson, supra at 95-97 [,106 S.Ct. at 1722-23]. In a more recent opinion, the Supreme Court ruled that the same constitutional claim existed when the defendant is not a member of the racial group purposely excluded from the jury. Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364 [113 L.Ed.2d 411] (1991). Thus, the defendant, in establishing his prima facie case, no longer needs to show that he is a member of a cognizable racial group. State v. Granier, 592 So.2d 883 (La.App. 4th Cir.1991).
This court further stated in Knighten:
The first issue which we will examine on review is whether the defendant sufficiently *758 established a prima facie case that the prosecutor used her peremptory strikes in a discriminatory manner. The trial judge never indicated whether the defendant made the requisite showing of facts and circumstances to establish an inference of discrimination. The trial transcript reveals that the trial judge, immediately after defense counsel raised a Batson claim, asked for the prosecution to give race-neutral reasons for its peremptory strikes. In State v. Collier, the Louisiana Supreme Court determined that where a trial judge, without expressly ruling on the issue, asks that race-neutral reasons be given, the reviewing court may conclude that a prima facie case existed. State v. Collier, 553 So.2d at 819, n. 5. However, this Court has previously held that the trial court need not find a prima facie case of discrimination, but may ask the prosecution to give its race-neutral reasons for its peremptory strikes as a precaution in the event that the appellate court determines that a prima facie inference existed. State v. Granier, 592 So.2d 883, 885 (La.App. 4th Cir.1991); see also State v. Collier, 553 So.2d at n. 5. Based upon the facts and circumstances, as evidenced by the trial record, we find that a prima facie showing of discrimination existed at the time the defense raised its Batson claim.
In footnote 2 this Court stated:
We note that the U.S. Supreme Court has stated that once the prosecutor has given race-neutral reasons for his peremptory challenges, the issue of whether a prima facie case was established is moot. Hernandez v. New York, ___ U.S. ___, ___, 111 S.Ct. 1859, 1866 [,114 L.Ed.2d 395] (1991). We understand this case to mean that once the prosecution proffers its race-neutral reasons, a trial court cannot then determine that a prima facie case did not exist, but must proceed to the ultimate conclusion of whether the defendant has fulfilled his burden of proving that the prosecutor discriminated in his peremptory exclusions.
In reviewing the standards to be applied by a trial court to a Batson challenge, this court quoted Batson, supra:
A judge cannot merely accept the reasons proffered at face value, but must evaluate those reasons as he or she would weigh any disputed fact. In order to permit the questioned challenge, the trial judge must conclude that the proffered reasons are, first, neutral and reasonable and, second, not a pretext. These two requirements are necessary to demonstrate `clear and reasonably specific... legitimate reasons.' Batson, 476 U.S. at 89, n. 20, 106 S.Ct. at 1724, n. 20.
As noted by this court in Knighten, supra:
The nature of a Batson claim requires that we give much deference to the trial court's determinations. It is the trial judge, as opposed to reviewing courts, who is present and witnesses the entire voir dire process. In most cases, it is the trial judge who is best able to determine whether the proffered race-neutral reasons are at all grounded in facts or circumstances evidenced during voir dire. `There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenges.' Hernandez, ___ U.S. at ___, 111 S.Ct. at 1869.
The court then stated the scope of appellate review in a Batson challenge appellate specification of error:
This Court must therefore determine whether the trial court applied the correct standards, properly weighed the facts and circumstances before it, and was not clearly erroneous in its finding that the prosecution's proffered explanations were reasonable, race-neutral, not a pretext, and legitimately related to the particular case. Knighten, supra, 609 So.2d at 954.
In the instant case, the trial court judge did not conduct or allow the attorneys to conduct a full voir dire, but rather asked questions of the panel as a whole, asking for a show of hands in response to specific questions. In addition, the questions *759 asked were not open ended questions designed to fully explore the belief and knowledge that each juror brought to the process, but rather were closed questions requiring only a yes or no response. The object and goal of the entire voir dire process is a full voir dire with open ended questions which lead to the exploration of each individual juror. Counsel should have objected and then proffered what questions he would have asked and why he was going to ask those questions onto the record in order to create a record for appeal. After conclusion of the group questioning by the judge, the judge then allowed each attorney 15 minutes to question the panel as a group. Counsel could have objected at this time, but failed to do so.
Upon conclusion of the 15 minute questioning, the trial court held a conference during which challenges were made.
Defense counsel argues that plaintiff counsel used his first five peremptory objections on the first five white jurors and that he was beginning to use his sixth on the sixth white juror, Lorna Ledet, when he was informed by the trial court that it was his sixth and last peremptory objection. Upon being so informed, plaintiff counsel withdrew his objection and accepted Ms. Ledet, using his sixth peremptory objection on Ms. Landry instead.
Plaintiff counsel argues that he did not use his first five objections on the first five white jurors, but rather that he accepted Harriet Langestein without challenge and that Ms. Langestein is white. Defense counsel argues that Ms. Langestein is "of indeterminate race".[1]
Plaintiff counsel further argues that he accepted Ms. Ledet and Theresa Nguyen. As discussed above, Ms. Ledet was plaintiff's sixth peremptory challenge which he withdrew in order to use against Ms. Landry, a white female corporate office of a petroleum company. Ms. Nguyen was Asian, specifically Vietnamese. Plaintiff counsel argues that Asians are white. We leave this philosophical discussion for another day and rely upon the assessment made by the trial court judge.
The trial court judge determined that plaintiffs peremptory challenges were racially based, specifically that plaintiff was attempting to keep white people off of the jury. The trial judge thus then requested race-neutral reasons for plaintiffs challenges. Plaintiff stated that he challenged the first juror Barbara S. Carriere, a white married female on the grounds that she did public relations work for a vocational rehabilitation program. However, plaintiff did not challenge Florence Jackson, a married black female respiratory therapist at Ochsner Hospital, Paris Coleman, a black female student worker at L.S.U. Medical School, or Charmaine Auzenne, a black female secretary at Tulane Medical Center.
Plaintiff next challenged Diana Dupre, a single white female marketing director for Weber Realty on the grounds that a single career woman would not be sympathetic to his client. He did not challenge any of the single black career women.
Plaintiff next challenged Hazell D. Froehlich, a married white female who works as a bartender at Best Western Hotel on the grounds that she was on her feet all day and thus would not be sympathetic to the plaintiff. He did not challenge Annie Higgenbotham, a black married female laundress employed at the Hilton Hotel, Doris LeBlanc, a black female K & B employee or Aurora Hills, a black female bus person at International House, both of whom are also on their feet all day.
He next challenged Elizabeth R. Pennell a single, white teacher, but did not challenge Nathachia Hampton, a black female daycare teacher.
He next challenged Evelyn Landry, a married white female executive secretary for Petrotech, Inc., who plaintiff alleges *760 was a corporate officer. He did not challenge Labethea Tyner, a married black female executive secretary at Desire Community Housing, Gwendolyn Davis, a divorced black female administrative secretary for HANO or Charmaine Auzenne, a divorced black female secretary at Tulane Medical Center.
In Knighten, supra, this court stated:
Other courts have rejected explanations for challenges where the prosecutor failed to exclude other prospective jurors, who were not of a racial group, who shared the same characteristic as that claimed as the reason for the challenge. State v. Collier, 553 So.2d at 822; see also U.S. v. Clemons, 843 F.2d 741 (3rd Cir.1988); U.S. v. David, 803 F.2d 1567 (11th Cir.1986); State v. Gilmore, 103 N.J. 508, 511 A.2d 1150 (1986); State v. Slappy, 522 So.2d 18 (Fla.1988).
In the instant case, plaintiff challenged white jurors with certain characteristics, but failed to challenge African-American jurors with the same characteristics. Accordingly, we find that the trial court did not err in finding that the plaintiff's reasons were not race-neutral, were not legitimate and were a pretext. To paraphrase Knighten at page 958 quoting Batson, 476 U.S. at page 90, 106 S.Ct. at 1718:
Selection procedures that purposely exclude white persons from juries undermine public confidence in the fairness of our system of justice.
Lastly we note that plaintiff could have taken a writ on this matter at the time of voir dire instead of proceeding to trial and later raising it as an issue on appeal. The reputed error committed is the result of an interlocutory ruling, not a final judgment. Accordingly the proper remedy in a civil trial is a writ, not an appeal after the judgment is final. Indeed, it is only common sense that if a writ is taken on a civil voir dire Batson challenge, then this court can review and determine at the time if an error has been made. To proceed to trial when there may be an error which can nullify the entire proceeding not only gives one party two bites at the apple, but also is a tremendous waste of judicial time and resources. Judicial economy, procedural due process, and equal protection all mandate that Batson challenges to civil trials must be reviewed on writ. We note that via emergency writ procedures and appellate court stay orders, a Batson challenge handled by writ need not cause the loss of a trial date.
In conclusion we note that the trial court did not err in its finding that a pattern of racially based peremptory challenges existed and that the reasons for those challenges were not race-neutral or legitimate and were a pretext. We further note that plaintiff's goal to exclude whites from the jury based upon the belief that black jurors award higher damage awards to black plaintiffs because they are all black is not a constitutionally permissible objective of trial procedure and is violative of equal protection and procedural due process.
For the reasons discussed, the judgment of the district court is affirmed.
AFFIRMED.
KLEES, Judge, concurring.
The record in this matter adequately demonstrates that the trial Court was correct in its determination that there was discrimination in the jury selection process and its subsequent disallowance of the improperly challenged jurors was proper. I concur in the result reached by the majority.
NOTES
[1] There are many people in the City of New Orleans whose racial and ethnic heritage are not readily apparent upon visual inspection. Thus it is possible that plaintiff's counsel thought that Ms. Langestein was white and defense counsel thought that Ms. Langestein was African-American. Accordingly, we must rely upon the contemporaneous assessment made by the trial court judge.