802 So.2d 643 (1999)
Joseph CALCAGNO, Jr. and Lynne Calcagno
v.
Donald A. GONZALES, Jr., ABC Insurance Company, et al.
No. 99-CA-287.
Court of Appeal of Louisiana, Fifth Circuit.
October 13, 1999.
Order Granting Rehearing for Limited Purpose November 8, 1999.
Charles A. Kronlage, Jr., Curtis C. Kronlage, New Orleans, Louisiana, for appellants Joseph Calcagno, Jr. and Lynne Calcagno.
Joseph C. Casler, New Orleans, Louisiana, for appellee Progressive Insurance Company.
Panel composed of Judges SOL GOTHARD, JAMES L. CANNELLA and THOMAS F. DALEY.
CANNELLA, J.
Plaintiffs, Joseph and Lynne Calcagno, appeal a judgment for damages in an automobile accident case filed against their uninsured/underinsured motorist (UM) carrier, Progressive Insurance Company (Progressive.) We reverse the denial of the motion in limine, affirm liability and amend the damages.
Plaintiffs were involved in an automobile accident on March 24, 1996. While traveling on Power Boulevard in Metairie, Louisiana, their vehicle was struck in the rear by an automobile owned and driven by Donald Gonzales.
*644 Plaintiffs filed suit on June 4, 1996 against Progressive, plaintiffs' UM insurer. Suit was amended to add Gonzales and his alleged insurer. However, it was subsequently discovered that Gonzales was uninsured.
Prior to trial, Progressive unconditionally tendered $27,000 and $2,500 in medical payments to Lynne Calcagno and unconditionally tendered $29,500 and $2,500 in medical payments to Joseph Calcagno.[1] On March 17, 1998, plaintiffs filed a Motion in Limine to exclude any evidence of the medical payments and the unconditional tenders. The trial judge denied the motion and on March 20, 1998, this Court denied relief, finding no error in the admissibility of the evidence.
A jury trial was held on March 18, 19 and 20, 1998, during which, the evidence of the medical payments and tenders were admitted. The jury awarded each plaintiff the amount of $500 for general damages and medical expenses to Lynne Calcagno of $1,038 and to Joseph Calcagno of $925.
On appeal, plaintiffs assert that the trial judge erred in allowing the evidence of the medical payments and tenders to be admitted. Further, they contend that this Court should perform a de novo review of the damages because of that legal error and the damages should be increased.

EVIDENCE OF TENDERS
The admissibility of evidence of compromise, settlement and tender are regulated by La.C.E. arts. 408, 409, 411 and 413. Under C.E. art. 408 A, evidence of an offer and/or acceptance of compromise of a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount, unless it is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay or proving an effort to obstruct a criminal investigation or prosecution. C.E. Art. 409 provides that evidence of furnishing or offering or promising to pay expenses or losses is not admissible to prove liability, nor is it admissible to mitigate, reduce, or avoid liability, unless the evidence is offered solely for another purpose, such as to enforce a contract. C.E. art. 411 prohibits communicating the amount of an insurance policy to a jury, unless the amount of the policy is in dispute. Finally, C.E. art. 413 states that, "Any amount paid in settlement or by tender shall not be admitted into evidence unless the failure to make a settlement or tender is an issue in the case."
We find no cases directly on point to our issue. However, we conclude that even if evidence of the tenders were admissible under C.E. art. 409, as alleged by defendant, the evidence of the amounts is not admissible under C.E. art. 413. Further, this lawsuit is not to enforce a contract, which would make evidence of the tenders admissible under C.E. art. 409. This is a suit for damages. Defendant does not dispute that it owes anything under the contract. In fact, it has paid certain sums under the contract. Defendant here only disputes the amount to which the plaintiffs are entitled. The jury in this case was called upon to determine the whole of plaintiffs' damages, not whether the contract should be enforced. Further, considering the award by the jury, it is apparent that they considered the tendered amounts in reaching the verdict. Since this was legal, prejudicial error, we agree with plaintiffs that this Court must conduct a de novo review of the damages. Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745-746 and cases cited therein.

*645 DAMAGES
At the time of the accident, Joseph Calcagno was 66 years old and Lynne was 55 years old. The couple had been married for 35 years and retired from a seafood market business which Joseph Calcagno had owned and worked in for 40 years. In their retirement, they enjoyed horse racing since they had owned racehorses in the past. The day of the accident, they were going to a local off track horse racing parlor. In addition, they had been considering seeking part-time work as casino card dealers and had attended a 5 week school to learn the skill. The couple have 2 daughters and 3 young grandchildren. Both had been in good health prior to the accident. Joseph Calcagno had not seen a doctor in 12 years, since he fractured his pelvis in an accident in 1981. Lynne Calcagno was being treated for a foot ailment, but neither of the plaintiffs had any prior neck or back problems and she had no prior chest or wrist injuries.
The Calcagnos testified that the Gonzales car struck 2 times with such force that Joseph Calcagno's hat flew into the back seat, as did Lynne Calcagno's wig and one earring. Gonzales tried to leave the scene by going around plaintiffs' car, but stayed when the couple told him to stop. He told them that he fell asleep at the wheel. Neither plaintiff felt the necessity to go to an emergency room, although Lynne Calcagno noticed slight discomfort in her neck, chest and wrist. After the accident was reported to the police, they continued on to the off-track betting establishment. There they socialized with friends and had dinner. Three to 4 hours later, both began to feel more pain and discomfort. His pain was in his neck and head. Her pain was in her neck, chest and wrist. The couple took some Tylenol and went home. Each testified that the pain began to escalate as the evening went on, causing headaches and nausea. They were forced to go to bed early. Lynne Calcagno said that, after she lay down, she could not lift her head when she tried to turn over. Joseph Calcagno subsequently notified Progressive of the accident because it did not appear that the tortfeasor had insurance.
Plaintiffs testified that each continues to suffer pain. Joseph Calcagno suffers with neck, back and hip pain and headaches, sometimes accompanied by nausea. He said that he has difficulty picking up heavy objects and cannot do anything physical, like washing the car, without having to lay down after for a few hours. Because walking hurts his hip, he cannot exercise on his treadmill anymore. The pain wakes him when he tries to turn over in his sleep. He believes that he will need surgery, but is delaying as long as he can. In addition, neither he nor his wife can pick up or play with their 7 year old and 8 month old grandchildren.
Lynne Calcagno suffered similar problems in her neck. She also sustained a wrist injury and a fractured rib. The rib hurt when she laughed, coughed or sneezed. At the time of trial, her wrist pain and rib fracture had healed. However, she stated that she continues to have problems with her neck. She cannot ride in the car for any length of time because of the pain. If she sits too long, the pain radiates from her skull into her shoulder, which also gets stiff. She has trouble playing cards, a frequent entertainment before the accident. She also has difficulty reading because she cannot sit long. In addition, her 94 years old bedridden mother had been living with them at the time of the accident, but because Lynne Calcagno could no longer physically assist her, she was forced to place her in a nursing home. The frequency of the couple's card-playing *646 has diminished from 1 to 2 times per week in 1997 to every 2 months at time of trial. The couple still goes to the horse races. Lynne Calcagno testified that her orthopedic surgeon has recommended neck surgery to stabilize the cervical discs by fusion. Although she knows she needs it, she is frightened of the surgery and has been putting it off as long as she can. She is willing to get a second opinion.
Dr. Bernard Manale, an orthopedic surgeon, began treating plaintiffs a few days after the accident on March 27, 1996. Plaintiffs were still under Dr. Manale's care at the date of trial. Over the course of the 2 years leading to the trial, he prescribed physical therapy and pain medication. He obtained X-Rays and Magnetic Resonance Imaging (MRI) tests. The couple went to therapy 3 times a week for 4 months. They stopped when it became apparent that the treatments were not helping. Plaintiffs were also examined one time by Dr. Robert Steiner, an orthopedic surgeon.
Dr. Manale testified that his initial exam showed that Lynne Calcagno was tender on her chest, rib and had spasms and restricted motion in her neck. The X-rays taken of her rib, wrist and neck were normal. A subsequent bone scan revealed that one of her ribs was fractured. An MRI taken on May 29, 1996 revealed a herniated or ruptured disc at C6-7. Although the doctor said the rupture was not impinging on a nerve, the condition can nevertheless be painful. He also stated that it was unlikely that a rupture would be asymptomatic. Dr. Manale saw Lynne Calcagno 12 more times before trial. As her neck pain did not abate, physical therapy was discontinued and she continued to be treated conservatively. In November of 1996, Dr. Manale began discussing the possible need for surgery, but no decision was made. In January of 1997, her wrist was improving, but was still somewhat stiff. Throughout the months of treatment, the doctor frequently found spasms and restricted motion in her neck. When she did not improve, he recommended anterior cervical fusion of the problem discs. Dr. Manale testified that the purpose of the surgery is not to relieve pressure on a nerve since there is no impingement, but to insert a bone graft to stop the movement of the unstable discs. He said that when the movement stops, the patient has an 80% chance of the pain stopping. Her disability after the surgery would be small, about 7%. Without the surgery, he stated that she will probably suffer continued pain for 5 to 10 years. The cost of the surgery is approximately $6,000 for the surgeon and $20,000 for the hospital. Dr. Manale concluded that the accident caused the triggering of her pain.
Dr. Manale treated Joseph Calcagno as well. Dr. Manale stated that he first complained of pain on both sides of his neck and low back pain with movement. Dr. Manale found spasms in his neck and restricted motion. The low back was mildly restricted, but also exhibited spasms. Later X-rays showed cervical spondyloses (arthritis), common in a 64 year old man. Dr. Manale testified that a person can have this condition without pain, but that trauma can trigger painful symptoms. Joseph Calcagno also has a bone spur at the top of one vertebra, L-5, of the lumbar spine. This condition can be caused by the ligament pulling away or being diseased or by arthritis and is not always painful. Trauma can also trigger pain from this condition. Dr. Manale believed that the force of the twist and turning from the collision weakened the already aged ligament structure of this 64 year old man, thereby causing the neck and back pain. The doctor also found a bruise on his heel that he attributed to the accident. Joseph Calcagno was also sent to physical therapy. *647 He also discontinued this after a few months with no relief.
Dr. Manale testified that Joseph Calcagno's MRI of the neck showed degenerative disc disease at multi-levels. He stated that there are bulging discs at C2-3, C3-4, C4-5 and C6-7. There is no impingement of the nerve and this finding is not uncommon in his age group. The doctor saw Joseph Calcagno 16 times. Throughout all of those visits Joseph Calcagno exhibited neck and back pain and restricted neck motion. In August of 1996, he was experiencing radiating pain from the left buttock area into his leg and heel. A lumbar MRI was taken in September of 1996. The test showed degenerative disc changes with a slight bulge at L-4-5 and desiccation (loss of fluid) at L-11-12 (near the rib cage), but no rupture. Again, these findings are not unusual for his age. However, the doctor stated that trauma can trigger pain from these conditions. Joseph Calcagno was treated with therapy, medication and a corset to restrict movement. His condition did not improve. Dr. Manale found neck spasms on examination at various times. He specifically notes the spasms in his testimony in March of 1996, November of 1996, January of 1997 and February of 1998. Dr. Manale stated that, during the other visits, Joseph Calcagno shows no improvement. Dr. Manale felt that he should have a discogram to help determine which disc is causing the pain. Although the effectiveness of the procedure is the subject of medical debate, he thought it would be helpful in Joseph Calcagno's case. The doctor would not recommend surgery at this point without a discogram. Dr. Manale noted that because of his age, Joseph Calcagno spinal structure would not hold up to trauma as well as a younger person. Dr. Mande related the pain to the accident.
Dr. James Keating, an expert radiologist, testified that the MRI results are consistent with Joseph Calcagno's neck pain. Although the bulges noted in the multi-levels were small, they become more significant in the cervical spine because it is a smaller area than the lumbar spine. Dr. Keating also reviewed the cervical MRI. He stated that there is a central herniated disc at C6-7 (the lower end of the cervical spine), which correlates with her complaints of neck pain.
Dr. Sherman Brown, an expert radiologist, testified that Joseph Calcagno's lumbar MRI shows a desiccated disc at L-5, S-1, which is consistent with post-traumatic degenerative disc disease. He also said that there is a mild diffuse bulging where it indents the sac containing the nerve roots. This condition can cause symptoms referred to the lower extremity and correlates with lumbar pain and radiating pain into the left leg. Dr. Brown noted that a person can have these findings and not experience any pain and that trauma can trigger the onset of painful symptoms.
Dr. Robert Steiner, an orthopedic surgeon, examined both plaintiffs on one occasion on March 5, 1997. He was not provided Dr. Manale's notes or conclusions. During his examination of Lynne Calcagno, he did not find any spasm, but she was tender on palpation on the right shoulder, on her wrist and on the C-5-6, C-6-7 area. He noted her X-rays and MRI showed a healed rib fracture, normal wrist and minimal annular bulging at C-6 and -7. He concluded that she has degenerative changes normal for her age. He concluded that Mrs. Calcagno does not need surgery. He conceded that she could have pain without objective findings, although her range of motion was restricted in all directions.
Dr. Steiner testified that Joseph Calcagno also showed restricted motion in both his neck and back. He was also tender *648 when palpated in his neck. Dr. Steiner examined his heel and concluded that the pain is from a heel spur, a condition common to the aging process. He reviewed Joseph Calcagno's X-rays and MRIs, which showed mild narrowing of the discs at C5-6 and C6-7 and some spurring, which is normal for his age. Dr. Steiner agreed that the lumbar spine shows mild bulging at L4-5 and L5, S-1, which are degenerative changes, and that there is no herniation of the dies. He concluded that none of the findings are related to the accident and that they do not warrant surgery. Dr. Steiner was unaware that Dr. Manale documented numerous instances of neck spasms during his treatment of both plaintiffs. He also agreed that radiating pain can be a sign of nerve root impingement and was not aware of Dr. Manale's documentation of his complaints of radiating pain.
Dr. Steven Yellin, an expert radiologist, reviewed the X-rays and MRIs and concluded that Lynne Calcagno's results are common to the aging process and do not show any nerve impingement. He noted that her results indicated buckling of the ligament at C6-7. He agreed that trauma can cause the ligaments to buckle. Dr. Yellin further stated that the dessication of her discs are normal. He noted that the bone spurs are the body's unsuccessful way of attempting to stabilize an area of instability. However, he agreed that trauma can cause the spine to become unstable. Nonetheless, he concluded that both plaintiffs are suffering from the normal aging process.
Jennifer Shelvin, Progressive's claims adjuster, testified that as of the date of trial, plaintiffs had incurred $13,648 in medical bills for Joseph Calcagno and $11,567 for Lynne Calcagno.
The liability of the tortfeasor was stipulated during trial. The only issue before us is the damage award.
The evidence shows that both plaintiffs were healthy prior to the accident and neither plaintiff had prior back or neck problems. There is nothing in the evidence to dispute their subjective complaints of escalating pain after the accident. Further, the complaints are supported by the objective findings of spasms over the course of their treatment. Thus, we conclude that the symptoms of both plaintiffs were triggered by the accident.
Although retired, both plaintiffs enjoyed a relatively active lifestyle, which changed to some degree due to the restrictions the neck and back pain imposes on them. Thus, plaintiffs are entitled to an award for their medical expenses and general damages, subject to the policy provisions and credit for payments made to them.
For general damages, we award Lynne Calcagno $30,000 for past pain and suffering due to her neck injury, $5,000 for her wrist injury, $5,000 for her injured rib and $15,000 for residual pain and suffering, for a total of $55,000 in general damages, plus her already awarded medical expenses in the amount of $11,567. Joseph Calcagno is awarded $20,000 for past pain and suffering attributed to his neck and low back and $10,000 for his residual pain and suffering, for a total of $30,000 in general damages, plus $13,648 for his already awarded medical expenses.
Accordingly, the judgment of the trial court is affirmed in part and affirmed as amended to award Lynne Calcagno general damages in the amount of $55,000 and medical expenses in the amount of $11,567. Joseph Calcagno is awarded general damages in the amount of $30,000, plus medical expenses of $13,648. These awards are subject to the insurance policy provisions. Furthermore, Progressive is entitled to credit for prior payments made.
*649 Costs of appeal are to be paid by Progressive Insurance Company.
JUDGMENT DENYING MOTION IN LIMINE REVERSED. JUDGMENT AFFIRMED AS TO LIABILITY AND AMENDED AS TO DAMAGES. JUDGMENT IS AFFIRMED AS AMENDED.

ON REHEARING
We grant this rehearing for the limited purpose of amending the award medical expense incurred by Joseph Calcagno, Jr. from $13,648 to $15,031 and the amount paid by Progressive to Joseph Calcagno, Jr. prior to trial from $33,000 to $27,700.
Accordingly, the judgment of the trial court is affirmed in part, amended in part and affirmed as amended to award Lynne Calcagno general damages in the amount of $55,000 and medical expenses in the amount of $11,567. Joseph Calcagno, Jr. is awarded general damages in the amount of $30,000, plus medical expenses of $15,031. These awards are subject to the insurance policy provisions. Furthermore, Progressive is entitled to credit for prior payments made of $27,700.
Costs of appeal are to be paid by Progressive.
REHEARING GRANTED.
NOTES
[1] The policy limits for the medical payments provision are $5,000.