# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 09-844

DONALD R. ALEXANDER

VERSUS

IRA M. TATE, ET AL.

************

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 107,905
HONORABLE CHARLES L. PORTER, DISTRICT JUDGE

************

## DAVID E. CHATELAIN[*]
## JUDGE

************

Court composed of Oswald A. Decuir, Jimmie C. Peters, and David E. Chatelain, Judges.

AFFIRMED.

Terry B. Loup
Roderick A. James
Morris Bart, LLC
909 Poydras Street, Suite 2000
New Orleans, Louisiana 70112
(504) 599-3254
Counsel for Plaintiff/Appellee:
   Donald R. Alexander

---

[*]Honorable David E. Chatelain participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

**Ian A. Macdonald**
**Jones Walker**
**Post Office Drawer 3408**
**Lafayette, Louisiana  70502-3408**
**(337) 262-9000**
**Counsel for Defendants/Appellants:**
  **Zack's Auto Parts, Inc.**
  **Ira M. Tate**
  **Progressive Casualty Insurance Co.**

**CHATELAIN, Judge Pro Tempore.**

In this suit arising from a motor vehicle accident, the defendants appeal the trial court's denial of their request to exercise a peremptory challenge to exclude a potential juror and allowing the plaintiff to introduce information concerning his settlement of a separate, unrelated motor vehicle accident claim. The defendants also appeal the amount the jury awarded for general damages and damages for loss of enjoyment of life. For the following reasons, we affirm.

## FACTS

On August 3, 2005, Donald Alexander's vehicle was hit broadside by a vehicle driven by Ira Tate when Mr. Tate failed to see Mr. Alexander's vehicle as he approached the intersection of Louisiana Highway 85 and Hubertville Road in Iberia Parish. Mr. Alexander testified that he saw Mr. Tate's vehicle stopping at the stop sign as he approached it and thought Mr. Tate was stopped. According to Mr. Alexander, Mr. Tate's vehicle kept creeping forward, so he moved to the other lane of travel to avoid a collision and hit his brakes, but the vehicles collided anyway. Mr. Alexander sued Mr. Tate; Mr. Tate's employer, the owner of the vehicle driven by him; and the insurer of Mr. Tate's employer to recover damages he suffered as a result of the collision.

Mr. Alexander was forty-six years of age at the time of the accident. The Social Security Administration had declared him disabled due to a heart condition. After the accident, an ambulance transported him to the New Iberia Medical Center emergency room. He complained of abrasions to his right forehead and right elbow and pain on the left side of his neck and in his low back. The emergency room doctor prescribed Flexeril for muscle spasm and Voltaren for pain. X rays taken that day

1

revealed degenerative changes in Mr. Alexander's middle and low cervical spine. Thereafter, Mr. Alexander sought medical treatment for his injuries from Dr. Keith Mack, a general practitioner; Dr. Allen J. Johnston, an orthopedist; and Dr. Sandra Weitz, an anesthesiologist and pain management specialist.

Mr. Alexander first saw Dr. Mack six days after the accident. He complained of pain on the left side of his neck and his low back. He also had a small scratch on his forehead, which was healed, and skin abrasions on his right elbow. Dr. Mack instructed Mr. Alexander to continue taking the medication the emergency room doctor prescribed and also treated him with heat, massage, ultrasound, and electronic stimulation in his office. On September 2, 2005, Mr. Alexander's neck was x-rayed again. The X rays were interpreted as evidencing cervical spasm and degenerative cervical discs. The medications and treatment Dr. Mack prescribed were not providing Mr. Alexander lasting relief, and Dr. Mack referred him to a physical therapist in his office.

Mr. Alexander returned to Dr. Mack on November 15, 2005, complaining that his neck and low back were not improving, the medications were not alleviating his pain, the physical therapy provided only temporary relief of his pain, he was having trouble sleeping, and he was stiff when he rose in the mornings. Dr. Mack prescribed a new anti-inflammatory medication and another muscle relaxer. He also suggested that Mr. Alexander get MRIs of his neck and back and a second opinion from an orthopedist. Mr. Alexander returned a month later; his complaints were the same. Dr. Mack suggested that he keep his previously-scheduled appointments for MRIs and a second opinion.

2

On January 23, 2006, Mr. Alexander saw Dr. Mack again and reported that he felt much better and that he was essentially pain free. Dr. Mack discharged him and instructed him to return if needed. Approximately ten days later, Mr. Alexander returned, complaining of recurrent pain and stiffness in his neck and back. MRIs of his neck and low back were performed on March 3, 2006. The MRI of Mr. Alexander's back revealed a paracentral disc herniation with an annular tear at L4-5, with spinal canal stenosis, facet arthropathy, ligamentous hypertrophy, and a right paracentral disc herniation at L5-S1. The MRI of his neck revealed a central disc herniation, resulting in borderline spinal canal stenosis and narrowing of the spinal canal at C6-7; ventral annular bulging at C5-6; and right paracentral annular bulging at C4-5. There was spur formation at C4-5 and C5-6. Thereafter, Drs. Johnston and Weitz treated him.

Mr. Alexander's first visit with Dr. Johnston was March 17, 2006. He complained of neck and back pain and rated his pain as six out of ten in both areas. He denied numbness, tingling, and weakness in his arms but stated he had intermittent headaches and also complained of pain radiating down his right leg to his knee, which walking aggravated. Dr. Johnston prescribed new medications, a TENS unit to stimulate the muscles in his back, and home exercise. He also ordered a nerve conduction study which was conducted on April 28, 2006. The study revealed that Mr. Alexander had a pinched nerve or S1 radiculopathy going into his left leg. Dr. Johnston testified that this finding was consistent with Mr. Alexander's lumbar MRIs and that he thought the L5-S1 disc herniation could have caused the irritated nerve root.

On June 16, 2006, Mr. Alexander reported significant pain in his neck and back to Dr. Johnston. Dr. Johnston recommended that he see a spine specialist because his neck pain was worse than his back pain. On August 15, 2006, Dr. Johnston gave Mr. Alexander a steroid injection in his low back, which Mr. Alexander reported as providing him significant relief for his back pain and leg symptoms.

In July 2006, Mr. Alexander first saw Dr. Weitz. He complained of neck and low back pain; he stated that his neck pain radiated into his shoulder but the pain in his low back did not radiate. On November 16, 2006, Dr. Weitz injected an epidural steroid into Mr. Alexander's cervical spine at C6-7. Two weeks later, Mr. Alexander reported that the injection had given him tremendous relief and had reduced his neck pain from seven to two on a scale of one to ten. In June 2007, Mr. Alexander had Dr. Weitz repeat the steroid injection, which Dr. Weitz testified was not unusual. Thereafter, Mr. Alexander reported that his neck pain was better and that he had more low back pain than neck pain at that time.

Dr. Weitz testified that more probably than not Mr. Alexander's degenerative changes of facet arthropathy and ligamentous hypertrophy at L4-5 existed and were asymptomatic before the accident but were made symptomatic by the August 2005 accident. She also testified that she would expect his pain to wax and wane as Mr. Alexander complained his had.

Mr. Alexander returned to Dr. Johnston in late January 2007. He reported mild discomfort in his neck and back but felt he could return to his regular activities. Dr. Johnston assigned him a 10-12% permanent impairment rating and believed he could do light to medium duty work at that time. In October 2007, Mr. Alexander saw Dr. Johnston and stated that he was improved but that he was beginning to

4

experience more neck discomfort. Dr. Johnston refilled his medications and told him to return if he did not improve. On December 21, 2007, Dr. Johnston gave Mr. Alexander a second cervical steroid injection.

On March 3, 2008, Mr. Alexander was in another automobile accident, and he returned to Dr. Johnston on April 25, 2008. Upon his return to Dr. Johnston, he rated his pain as eight on a scale of one to ten; his pain had been four on scale of one to ten in December 2007.

Mr. Alexander pursued a claim for damages he suffered as a result of the March 2008 accident, which he settled for $8,000. Issues regarding causation arose herein with regard to injuries Mr. Alexander suffered in that accident, i.e., what, if any, injuries did the second accident cause; what pain and/or limitations were attributable to his pre-existing degenerative spine conditions; and what, if any, impact did the March 2008 accident have on the injuries caused by the August 2005 accident. At trial, Mr. Alexander sought to inform the jury that he settled his claim regarding the March 2008 accident for $8,000. The defendants objected, but the trial court ruled that the evidence was admissible.

The jury returned a verdict in favor of Mr. Alexander, assessing him with 10% fault and awarding him the following damages:

| | |
|---|---|
| Past Medical Expenses | $ 20,082 |
| Bodily Injury, Past and Future Physical and Mental Pain and Suffering, Mental Anguish, and Disability | $192,000 |
| Loss of Enjoyment of Life | $ 50,000 |

The defendants appeal and assign four errors: (1) the trial court erred in denying the defendant's request to exercise a peremptory challenge because there was

no evidence or finding that the exercise of that challenge was unconstitutionally discriminatory; (2) the trial court erred in allowing Mr. Alexander to introduce evidence of the settlement amount of the claim he made regarding his March 3, 2008 automobile accident; (3) the jury's award of $192,000 for bodily injury, past and future physical and mental pain and suffering, mental anguish, and disability is an abuse of discretion and should be reduced; and (4) the jury erred in awarding $50,000 for loss of enjoyment of life.

## DISCUSSION

### Batson Challenge

The defendants contend that the trial court erred in denying their request to peremptorily challenge a prospective juror, Terri Mayes Thompson. Their contention is twofold: (1) Mr. Alexander failed to establish a prima facie case of discrimination; and (2) the trial court failed to determine whether Mr. Alexander carried his burden of proving purposeful discrimination.

During the jury selection process, defense counsel attempted to exercise a peremptory challenge to exclude Ms. Thompson from the jury. Mr. Alexander and Ms. Thompson were from Jeanerette. As soon as counsel for Mr. Alexander raised a *Batson* objection, defense counsel immediately stated that he believed his challenge was legitimate because of Ms. Thompson's knowledge of Mr. Alexander from the community, explaining: "She knows him from the community, Your Honor. I'm just a little concerned about people who know - Jeanerette, as you know, is a small community and I'm concerned about that."

Counsel for Mr. Alexander countered that Ms. Thompson stated that she had seen Mr. Alexander around but did not know him and that she did not know any of

6

his family members. Defense counsel then opined that his reason had a "race neutral basis" and was, therefore, legitimate. Mr. Alexander's counsel responded by asking the trial court to consider that the defendants had used their other peremptory challenges primarily against African-American jurors.

During voir dire, Ms. Thompson had stated that "I don't have any association, but I am from Jeanerette and the person that I know as the plaintiff, Mr. Donald Alexander, I've seen him around Jeanerette." Defense counsel asked, "Would you have known his name but for today or you just knew him as somebody you had seen around?" The juror responded, "Just from when I've seen him. I don't know him – personally." She also denied knowing Mr. Alexander's family.

The trial court noted that defense counsel had not sought to exclude Wallace Davis, another potential juror from Jeanerette who had given almost the same responses Ms. Thompson gave.[1] In response, defense counsel explained that he wanted to back-strike Mr. Davis but was not allowed to do so.[2] The trial court continued, finding "Ms. Thompson was pretty neutral," and granted Mr. Alexander's Batson challenge.

In *Alex v. Rayne Concrete Service*, 05-1457, 05-2344, 05-2520 (La. 1/26/07), 951 So.2d 138, our supreme court restated that discrimination on the basis of race in the exercise of peremptory challenges is prohibited by the Equal Protection Clause of the United States Constitution. In *State v. Snyder*, 98-1078, p. 7 (La. 9/6/06), 942

---

[1]Implicit in the discussion on the record is that the two other jurors from Jeanerette referenced by the trial court and counsel were not African-American.

[2]Although the defendants have not raised an assignment of error regarding the trial court's handling of back-strikes, we note that our supreme court has held that this practice is neither constitutionally nor statutorily mandated in civil cases. *Riddle v. Bickford*, 00-2408 (La. 5/15/01), 785 So.2d 795. "[T]he right to back-strike in civil cases is left within the sound discretion of the trial judge, who ultimately has the responsibility for orderly conduct of the trial." *Id.* at 803.

So.2d 484, 489, *rev'd on other grounds*, 552 U.S. 472, 128 S.Ct. 1203 (2008) (quoting *Rice v. Collins*, 546 U.S. 333, 338, 126 S.Ct. 969, 973-74 (2006)), our supreme court set forth the process established by the Supreme Court to guide courts in the examination of peremptory challenges for constitutional infirmities:

> A defendant's *Batson* challenge to a peremptory strike requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Internal quotations and citations omitted.]

From the outset, the defendants contend that Mr. Alexander's *Batson* challenge fails because he did not establish a prima facie case of discrimination. This contention is without merit. The issue of whether Mr. Alexander met his burden of proof was rendered moot once defense counsel offered a race-neutral explanation for striking the challenged juror. *See State v. Hoffman*, 98-3118 (La. 4/11/00), 768 So.2d 542, *cert. denied*, 531 U.S. 946, 121 S.Ct. 345 (2000) (citing *State v. Green*, 94-887, p. 25 (La. 5/22/95), 655 So.2d 272, 288, where our supreme court adopted the rule set forth in *Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 1866 (1991), which states: "Once [an opposing party] has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the [challenging party] had made a prima facie showing becomes moot.") *See also, State v. Scott*, 04-1312

8

(La. 1/19/06), 921 So.2d 904, *cert. denied*, 549 U.S. 858, 1275 S.Ct. 137 (2006); *State v. Jacobs*, 99-991 (La. 5/15/01), 803 So.2d 933, *cert. denied*, 534 U.S. 1087, 122 S.Ct. 826 (2002); *State v. Hobley*, 98-2460 (La. 12/15/99), 752 So.2d 771, *cert. denied*, 531 U.S. 839, 121 S.Ct. 102 (2000).

The defendants also urge that the trial court failed to perform the third step of the *Batson* analysis. The third step of a *Batson* challenge requires the trial court to assess the plausibility of the challenger's proffered reason in light of all the evidence bearing on it. *Miller-El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317 (2005). The focal point of the third step of the *Batson* inquiry is the trial court's assessment of the "plausibility" of the proffered race-neutral explanation based upon the challenger's credibility and demeanor. *Snyder*, 942 So.2d at 490. In resolving the ultimate inquiry before it, whether the challenger's proferred race-neutral explanation should be believed, the trial court should examine all the evidence before it. *State v. Juniors*, 03-2425 (La. 6/29/05), 915 So.2d 291, *cert. denied*, 547 U.S. 1115, 126 S.Ct. 1940 (2006). Like other credibility determinations a trial court is called to make, there will seldom be much evidence on this trial court determination. *Holmes v. Great Atl. & Pac. Tea Co.*, 622 So.2d 748 (La.App. 4 Cir. 1993), *writ denied*, 629 So.2d 1178 (La.1993). A trial court's determination that a party's attempt to exclude a potential juror by discriminatory exercise of a peremptory challenge will not be reversed unless it is manifestly erroneous. *Alex*, 951 So.2d at 164 n.10; *State v. Robinson*, 02-1869 (La. 4/14/04), 874 So.2d 66, *cert. denied*, 543 U.S. 1023, 125 S.Ct. 658 (2004).

Contrary to the defendants' argument, the trial court's ruling that Ms. Thompson was neutral belies the defendants' contention that the trial court failed to consider the credibility of their proffered race-neutral explanation. Otherwise, the

9

trial court would have simply granted the defendants' request to peremptorily exclude Ms. Thompson.

Moreover, we cannot say that the trial court's refusal to allow the defendants to exercise a peremptory challenge against this juror was manifestly erroneous. First, notwithstanding the defendants' assertion to the trial court that Ms. Thompson knew Mr. Alexander, a close examination of the record shows that she had only seen him in Jeanerette and that she had "no association or connection with any of the parties." The defendants' more forceful assertion about Ms. Thompson's knowledge of Mr. Alexander is simply not supported by the record. Second, the trial court specifically observed that defense counsel had not sought to exclude Mr. Wallace, another potential juror from Jeanerette who gave similar responses as those Ms. Thompson provided during voir dire examination. Likewise, our review of the record further shows that Katina Miller was another potential juror from Jeanerette who also gave similar responses as those Mr. Wallace and Ms. Thompson gave. Defense counsel did not object to Ms. Miller serving on the jury.

"*Batson's* admonition to consider all relevant circumstances in addressing the question of discriminatory intent requires close scrutiny of the challenged strike[] when compared with the treatment of panel members who expressed similar views or shared similar . . . backgrounds." *State v. Elie*, 05-1569, p. 6 (La. 7/10/06), 936 So.2d 791, 796. Defense counsel's failure to object to Ms. Miller and Mr. Wallace belie his argument and further illuminate the trial court's assessment of the plausibility of defense counsel's proferred race-neutral explanation with regard to Ms. Thompson. Therefore, there is no merit to the defendants' assignment of error.

*Admission of Settlement Information*

After his March 2008 accident, Mr. Alexander sought damages for injuries he sustained in the accident. He settled his claim for $8,000 and sought to introduce evidence of this settlement amount at trial to establish that he was not seriously injured in that accident. The defendants objected to introduction of the settlement amount, claiming it was irrelevant and prohibited by La.Code Evid. art. 413 which provides: "Any amount paid in settlement or by tender shall not be admitted into evidence unless the failure to make a settlement or tender is an issue in the case." After arguments in an unrecorded sidebar conference, the trial court denied the defendants' objection and allowed Mr. Alexander to state that he settled the claim for $8,000.

The defendants' argue that Article 413 prohibited the admission of the settlement amount. This evidentiary ruling is subject to the manifest error standard of review. *Lam v. State Farm Mut. Auto. Ins. Co.*, 05-1139 (La. 11/29/06), 946 So.2d 133.

In support of their argument, the defendants cite *Calcagno v. Gonzales*, 99-287 (La.App. 5 Cir. 10/13/99), 802 So.2d 643. At issue in *Calcagno* was a claim by two insureds against their uninsured motorist insurer. The trial court allowed the insurer to introduce the amounts of unconditional tenders it made to the insureds prior to trial. The appellate court found that the jury's awards of $500 for general damages to each insured and medical expenses of $1,000 or less to each insured indicated that the jury considered those tenders in arriving at its damage awards and held that the trial court erred in allowing the amount of the tenders to be made known to the jury.

Mr. Alexander argues that the amount of the settlement was relevant and admissible because the defendants made the March 2008 accident and the extent of

the injuries he suffered therein an issue at trial. He claims that the settlement amount was relevant to establish that the March 2008 accident merely aggravated injuries he sustained in the August 2005 accident, that the aggravation resolved shortly after the accident, and that he thereafter returned to his pre-March 2008 accident condition.

Mr. Alexander urges that Article 413 should be read in conjunction with La.Code Evid. art. 408(A), which prohibits the admission of evidence concerning compromise or offers to compromise a disputed claim "to prove liability for or invalidity of the claim or its amount" but does not prohibit evidence that is otherwise admissible "merely because it is presented in the course of compromise negotiations" or when "the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution." La.Code Evid. art. 408(A). As support for his claim, Mr. Alexander relies on comments the authors of the "Handbook on Louisiana Evidence Law" made regarding Article 413. Those opinions state in part:

> This Article was particularly designed to protect a plaintiff in a personal injury suit from the introduction of evidence that would inform the jury of the amount plaintiff received in settlement from other alleged tortfeasors, or the amount received by other claimants in settlement of their claims against the defendant, when the purpose of such evidence is to minimize the value of plaintiff's claim, or suggests that he has already received adequate compensation.

GEORGE W. PUGH, ROBERT FORCE, GERALD A. RAULT, JR., AND KERRY TRICHE, HANDBOOK ON LOUISIANA EVIDENCE LAW, 410 (2008 ed.). The authors then correlate Article 413 to Article 408, explaining that while Article 408 excludes evidence of settlements for the limited purpose of "proving or disproving liability or amount thereof," Article 413 is written in broader terms than Article 408 and that it

12

"seemingly mak[es] evidence of settlements . . . inadmissible for any purpose." *Id.* The authors continue, however, noting: "It is believed that [Article 413] should not be given such broad scope, and where the amount paid in settlement or tender has a relevance independent of its tacitly forbidden use, it should be held admissible, subject, of course, to the balancing test of Article 403." *Id.*

There is no federal rule of evidence that is comparable to Article 413, but Federal Rule of Evidence 408 is comparable to La.Code Evid. art. 408. Jurisprudence under that rule holds that settlement terms pertaining to another dispute or litigation may be admissible to assist the trier of fact in understanding the case. *See Uforma/Shelby Business Forms, Inc. v. NLRB,* 111 F.3d 1284 (6th Cir. 1997); *Bradbury v. Phillips Petroleum Co.,* 815 F.2d 1356 (10th Cir. 1987).

We find the Handbook on Louisiana Evidence Law's observations regarding Article 413 and the federal jurisprudence persuasive and conclude that the trial court did not commit manifest error when it allowed Mr. Alexander to state the amount for which he settled his claim arising out of the March 2008 accident. Clearly, the settlement of this second accident did not involve the parties to this litigation, and it was relevant as to the severity of the injuries Mr. Alexander sustained in that accident.

***Damages***

Recently, in *Guillory v. Lee*, 09-75, p. 14 (La. 6/26/09), 16 So.3d 1104, 1116, the supreme court reiterated the long-held tenet that a jury has "great discretion" in assessing damages and that a jury's assessment of damages is "a determination of fact" which is "entitled to great deference on review." Accordingly, when reviewing general damage awards, our role is to review the trier of fact's exercise of discretion,

not to decide what we consider to be an appropriate award. *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994). If there is no clear abuse of discretion in the jury's awards, the awards must stand. *Coco v. Winston Indus., Inc.*, 341 So.2d 332 (La.1976).

### *Bodily Injury, Past and Future Physical and Mental Pain and Suffering, Mental Anguish, and Disability*

The defendants argue that the jury's award of $192,000 in general damages was an abuse of its discretion. They contend that the accident was simply an aggravation of pre-existing conditions, that Mr. Alexander had substantially recovered from his injuries caused by the August 2005 accident prior to his March 2008 accident, and that any pain and/or symptoms Mr. Alexander had after the March 2008 accident were related to his pre-existing conditions or the March 2008 accident.

The evidence establishes that before the accident, Mr. Alexander had pre-existing degenerative changes in his neck and low back. The degenerative changes in his back were asymptomatic until about seven months prior to the accident at which time the degenerative changes in his low back were symptomatic for a period of four to five months. The evidence further establishes that more likely than not the accident caused a right paracentral disc herniation at L5-S1, and a central disc herniation at C6-7 or, at the least, caused the asymptomatic degenerative changes in his neck to become symptomatic. Additionally, the evidence establishes that the pain Mr. Alexander suffered after the accident led him to have steroid injections in his low back and his neck, which successfully alleviated his pain for a period of time.

Mr. Alexander testified that the back pain he had before the August 2005 accident was not as severe or as long in duration as the pain he suffered after that accident. He further stated that the March 2008 accident aggravated the pain he

suffered after the August 2005 accident but subsided after a few months and that he thereafter returned to his pre-March 2008 status.

We find no abuse of discretion in the jury's general damage award. The jury was able to view Mr. Alexander testify and to consider his testimony in light of Drs. Mack's, Weitz's, and Johnston's testimonies and the evidence that he had sought treatment for low back pain prior to the August 2005 accident. The jury heard the doctors' opinions on causation and aggravation of pre-existing conditions, which included testimony that because Mr. Alexander did not have any complaints of neck pain before the accident, that, at a minimum, the accident caused his degenerative neck conditions to become symptomatic, and that because Mr. Alexander did not complain of pain radiating down his left leg until after the August 2005 accident, Dr. Johnston did not believe his low back herniation existed prior to that accident. Lastly, the jury apparently accepted Mr. Alexander's testimony that the March 2008 accident aggravated the problems he had before that accident, but his symptoms and pain levels returned to the levels that existed prior to that accident. In light of the issues concerning causation and/or aggravation of pre-existing conditions, we find no abuse in the jury's award for bodily injury, past and future physical and mental pain and suffering, mental anguish, and disability.

### Loss of Enjoyment of Life

The defendants urge that the jury's award of $50,000 for loss of enjoyment of life is excessive because Mr. Alexander's other health problems already compromised his quality of life. "Loss of enjoyment of life . . . refers to the detrimental alterations of a person's life or lifestyle or a person's inability to participate in the activities or pleasures of life that were formerly enjoyed." *McGee v. A C & S, Inc.*, 05-1036, p.

15

3 (La. 7/10/06), 933 So.2d 770, 773. Our review of the record shows a reasonable basis for the jury to determine that because the accident caused injuries, those injuries further diminished Mr. Alexander's already limited quality of life, making his loss greater than it may have been otherwise. Therefore, we cannot say that this conclusion is unreasonable or an abuse of the jury's great discretion in awarding damages.

## DISPOSITION

The judgment of the trial court is affirmed. All costs are assessed to the defendants.

**AFFIRMED.**